Edward Scarvalone
WILLENS & SCARVALONE LLP
40 Wall Street, Suite 4100
New York, New York 10005
Tel. (646) 200-6334
Fax (800) 879-7938
escarvalone@willensscarvalone.com

Jacob W. Buchdahl
Arun Subramanian
Cory S. Buland
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Telephone No. (212) 336-8330
Fax No. (212) 336-8340
jbuchdahl@susmangodfrey.com
asubramanian@susmangodfrey.com
cbuland@susmangodfrey.com

*Attorneys for Plaintiff-Relator Peter D. Grubea*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. PETER D. GRUBEA,<br><br>*Plaintiffs,*<br><br>v.<br><br>BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., J.P. MORGAN CHASE & CO., and JPMORGAN CHASE BANK, N.A.,<br><br>*Defendants.* | **SECOND AMENDED COMPLAINT**<br><br>13 Civ. 1467 (JSR)<br>**Jury Trial Demanded** |

Plaintiff-relator Peter D. Grubea ("Relator"), through his attorneys, Willens & Scarvalone LLP and Susman Godfrey LLP, alleges on information and belief as follows:

<u>**INTRODUCTION**</u>

1.      This is a case about banks and law firms, and how they have fleeced some of the most important governmental actors in the residential mortgage industry:  the Federal National Home Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Federal Housing Administration ("FHA") of the U.S. Department of Housing and Urban Development ("HUD").  Fannie Mae and Freddie Mac are government-

sponsored enterprises ("GSEs") under conservatorship by the United States of America (the "Government"), which have received nearly $200 billion in federal funding since the 2008 housing crisis.  FHA is the largest insurer of residential mortgages in the world.  In the wake of the housing crisis, defendants overcharged the GSEs and FHA by hundreds of millions of dollars for the rapidly proliferating services needed to file thousands of residential foreclosure actions.

2.     Relator brings this action on behalf of the United States of America (the "Government") against defendants Bank of America Corporation, Bank of America, N.A., J.P. Morgan Chase & Co., and JPMorgan Chase Bank, N.A) (collectively, the "Defendants").

3.     This action seeks to recover damages and penalties on behalf of the Government for the illegal and excessive claims made by the Defendants for reimbursement from Fannie Mae and Freddie Mac (collectively, "the GSEs") and FHA.  This suit further seeks damages and penalties against the Defendants for wrongfully keeping overpayments, years after they realized that they had received them.

4.     The GSEs – Fannie Mae and Freddie Mac – help lenders originate single-family mortgages by purchasing and guaranteeing mortgage loans by lender customers and by issuing debt securities that attract investors to the U.S. housing sector.  As part of those operations, the GSEs engage financial institutions to service mortgages by collecting payments from borrowers, by applying payments, by pursuing collections from delinquent borrowers, and by pursuing foreclosures on delinquent mortgages.  The GSEs contract with financial institutions, called "servicers," to perform these functions, and the GSEs reimburse servicers for certain expenses.

5.     FHA, through its Government-backed insurance programs, insures approved lenders against losses on mortgage loans, including losses incurred in foreclosure proceedings. FHA, like the GSEs, relies on the work of servicers.  In particular, in the event that a borrower

defaults on an FHA-insured mortgage, the servicer is able to submit a claim to FHA for the costs associated with the defaulted mortgage.

6.      One significant and costly function of mortgage servicing is the pursuit of foreclosure proceedings.  To pursue foreclosures, servicers typically engage law firms.  Both the GSEs and FHA typically pay attorneys a flat fee to handle foreclosures.  But the GSEs and FHA also reimburse servicers for other expenses incurred in the foreclosure process.   These foreclosure-related expenses, also called default-related legal expenses, typically include title searches (*e.g.*, to identify necessary parties), service of process (*e.g.*, to commence foreclosure proceedings with a summons and complaint), and publication and posting costs.  The GSEs and FHA limit servicers' rights to reimbursement to those foreclosure expenses that are necessarily incurred and reasonably priced in the area.

7.      Moreover, Fannie Mae's contracts with servicers contain a best value clause, and Freddie Mac and FHA require servicers to conduct ongoing quality control.  The Fannie Mae contract provides that both servicers and the law firms they employ "must make every effort to reduce default-related legal expenses," including expenses billed by title-search, service-of-process, and publication vendors.  Under the Fannie Mae contract, "[t]he servicer and the law firm must regularly examine the pricing offered by alternative vendors and negotiate for the best value."  Likewise, "[t]he servicer must attempt to minimize the costs incurred from vendors utilized by the law firm – such as auctioneers, process servers, title companies, posting companies, and newspapers or other publications – by ensuring that all costs are actual, reasonable, and necessary."

8.      The Defendants, on information and belief, knowingly or recklessly sought excessive reimbursements in violation of the reimbursement terms of Fannie Mae, Freddie Mac,

and FHA.  They overstated their claims for reimbursement.  In particular, on information and belief, instead of limiting their claims to necessary and reasonable fees as required, they submitted reimbursement claims for all foreclosure expenses without regard to how unnecessary or unreasonable they were.  Moreover, the Defendants failed, on information and belief, to make any effort – and thus certainly did not "make every effort" – to reduce foreclosure expenses as required by Fannie Mae or to conduct the quality control required by Freddie Mac and FHA.

9.      By abdicating their responsibilities and wrongfully seeking reimbursements for unreasonable and unnecessary foreclosure expenses, the Defendants opened the door to rampant profiteering by foreclosure expense vendors.  This profiteering became widespread throughout the United States in the wake of the housing crisis.  Vendors, as well as many foreclosure law firms, took advantage of the Defendants' lack of oversight.

10.      Law firms, such as the those identified in this complaint, faced rate pressures and caps on their attorneys' fees.  They created subsidiary or affiliated corporations ("affiliates") to generate additional profits by handling and billing for title searches, service of process, and related services.  These affiliates generated bills for unnecessary services and charged excessive rates, which the law firms passed along to their clients, including the Defendants.  Such affiliates – as well as other, non-affiliated vendors – profited by providing services at excessive rates, as well as services that were unnecessary and performed solely to generate fees.  For instance, one law firm's affiliates, as alleged herein, regularly; billed service of process and title searches at excessive rates; charged for service of process on state tax departments, in the absence of any tax liens; added improper document filing fees; and marked up charges from other vendors.  This firm and others thus found opportunities to bill foreclosure expenses at supra-market prices.

11.     This situation cost the GSEs and FHA hundreds of millions of dollars.   The Defendants, on information and belief, failed to limit reimbursement requests to necessary and reasonably priced items and made no effort to reduce foreclosure expenses or conduct quality control over such expenses.  As a result, law firms were able to create business models to profit at the expense of the GSEs and FHA.  Law firms and their affiliated vendors, such as those identified in this complaint, generated unnecessary and unreasonably priced fees, which they knew would be passed onto the GSEs and FHA.  Other vendors did the same.  When the Defendants received these inflated invoices, they turned them over to the GSEs and FHA, ensuring that the Defendants would not be left holding the bag for overpriced vendor services, while simultaneously saving the Defendants from spending resources on compliance, quality control, and efforts to negotiate better prices.  All the while, vendors, like the law firms' affiliates, profited handsomely.

12.     To this day, the Defendants, on information and belief, have not returned any of the overpayments they received from the GSEs or FHA.  Fannie Mae's rules include a specific obligation to return foreclosure expense overpayments, particularly when generated by a law firm and its affiliates.  Similarly, HUD rules obligate banks to reimburse FHA for any amount overpaid because of incorrect claims.  On information and belief, the Defendants were put on notice as early as 2013 (and no later than 2014) that the Government believed they may have received such overpayments.  Yet, on information and belief, none of the Defendants has returned any of those funds.

13.     Because these actions violate the False Claims Act, 31 U.S.C. §§ 3729-3733, Relator brings suit seeking treble damages and penalties on behalf of the Government.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 31 U.S.C. §§ 3730 and 3732(a), and pursuant to 28 U.S.C. §§ 1331 and 1345.

15.     This Court has personal jurisdiction over the Defendants because they have transacted business in this judicial district, have committed acts proscribed by 31 U.S.C. § 3729 in this district and maintain offices in this district.   Moreover, 31 U.S.C. § 3732(a) authorizes nationwide service of process.

16.     Venue is appropriate in this judicial district pursuant to 31 U.S.C. § 3732(a) because, *inter alia*, various Defendants reside or transact business in this district, and actions proscribed by 31 U.S.C. § 3729 occurred in this district.

17.     This action is not precluded by the public disclosure bars of the False Claims Act, 31 U.S.C. § 3730(e)(4).   On information and belief, there was no "public disclosure" of the matters alleged prior to filing of this action, and this action is not "based upon" any such disclosure.   Notwithstanding the foregoing, Relator has "direct and independent knowledge" of the instant allegations and voluntarily provided the information to the Government before filing this action.   Therefore, to the extent any of these allegations are deemed to have been based on a public disclosure, Relator is an "original source" of this information within the meaning of the False Claims Act and is expressly not subject to its public disclosure bar.

## PARTIES

18.     Plaintiff is the United States of America.

19.     Relator Peter D. Grubea ("Relator" or "Grubea") is an attorney currently residing in Erie County, New York.   At all relevant times, Grubea has practiced law in the State of New York.    His practice consists primarily of advocacy on behalf of consumers in bankruptcy

proceedings.  Over the last twenty-plus years, Grubea has handled approximately 10,000 such cases throughout the State of New York.

20.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A. is a national banking association and subsidiary of defendant Bank of America Corporation, with a principal place of business in Charlotte, North Carolina.  Collectively, defendants Bank of America Corporation and Bank of America, N.A., and their predecessor entities, are referred to as "Bank of America."

21.     Bank of America is a Fannie Mae, Freddie Mac, and FHA servicer, which has submitted claims for reimbursement of foreclosure expenses.

22.     Defendant J.P. Morgan Chase & Co. is a Delaware corporation headquartered in New York, New York.  Defendant JPMorgan Chase Bank, N.A. is a national banking association with a principal place of business in Columbus, Ohio.  Collectively, defendants J.P. Morgan Chase & Co. and JPMorgan Chase Bank, N.A., and their predecessor entities, are referred to as "JPMorgan Chase."

23.     JPMorgan Chase is a Fannie Mae, Freddie Mac, and FHA servicer, which has submitted claims for reimbursement of foreclosure expenses.

**OTHER FORECLOSURE SERVICE PROVIDERS**

24.     Rosicki, Rosicki & Associates, P.C. (the "Rosicki Firm") is a New York professional corporation with offices in Plainview, Batavia, and Fishkill, New York.  The Rosicki Firm's website characterizes the firm as "the leading mortgage banking law firm in New York."

25.     Paramount Land, Inc. ("Paramount") is a New York business corporation with its principal office in Plainview, New York.

26.     Threshold Land Inc. ("Threshold") is a New York business corporation, incorporated on May 30, 2003, and dissolved on July 11, 2011, with its principal office in Plainview, New York.  On information and belief, Paramount is the successor-in-interest to Threshold.

27.     Enterprise Process Service, Inc. ("Enterprise") is a New York business corporation with its principal office in Plainview, New York.

28.     McCabe, Weisberg & Conway, P.C. (the "McCabe Firm"), is a New York professional corporation with multiple locations throughout the Northeastern United States, including offices at 123 Broad Street, Suite 2080, Philadelphia, Pennsylvania, and at 145 Huguenot Street, Suite 210, New Rochelle, New York.

29.     Attorney Outsourcing Support Services, Inc. ("AOSS") is a Pennsylvania corporation with its principal office at 123 Broad Street, Suite 2080, Philadelphia, Pennsylvania.

30.     REO America Abstract, Inc. ("REO"), is a Pennsylvania corporation with its principal office at 123 Broad Street, Suite 2080, Philadelphia, Pennsylvania.

<u>**FACTS**</u>

**I.     THE SINGLE FAMILY MORTGAGE INDUSTRY**

31.     The single family mortgage industry consists of financial services and other firms that originate, underwrite, securitize, and service mortgages for residential properties designed to house one- to four-family dwellings.

32.     Mortgage origination is the process whereby a lender loans money to a borrower and receives a security interest in property, through a mortgage or comparable device that secures the loan.  Origination generally includes all the steps from receiving a loan application through disbursal of the loan proceeds.

33.     For more than thirty-five years, mortgages typically have been "pooled" to create an investment vehicle, often denominated as a trust, and interests in the trusts have been sold to investors that own interests in payment streams generated by principal and interest payments by the borrowers.

34.     After mortgages are originated, a "servicer" is responsible for mortgage administration activities, known as "servicing" activities, which generally include collecting payments from borrowers; applying payments made in an agreed-upon order to the borrower's indebtedness; distributing payments after allowable deductions to the investment trust entities for distribution to investors; making advances to cover delinquent mortgage payments and other costs, such as the costs of protecting and maintaining properties that collateralize mortgage loans when borrowers fail to do so; pursuing collections from delinquent borrowers; and pursuing either loss mitigation or foreclosure, as appropriate, to minimize the loss to investors and others when mortgagors become delinquent on mortgage payments.

II.     **THE GSEs and FHA**

A.     **Fannie Mae**

1.     **Fannie Mae's receipt of billions of dollars of federal funds**

35.     Congress originally chartered Fannie Mae in 1968 as a GSE intended to support the American housing market through the development of the secondary mortgage mark.  Fannie Mae's mission is to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae invests in residential mortgage-backed securities.  According to public reports, Fannie Mae holds or has securitized approximately 40% of all mortgages within the United States.

36.     The housing crash that began in 2007 severely damaged Fannie Mae financially

and rendered it unable to fulfill its mission without government intervention.  By September 2008, Fannie Mae was at the brink of insolvency.

37.    In response, Congress created the Federal Housing Finance Agency ("FHFA"). FHA is a federal agency created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2009) (codified at 12 U.S.C. § 4617), to provide oversight of Fannie Mae and Freddie Mac.

38.    On September 6, 2008, pursuant to HERA, the Director of FHFA exercised FHFA's statutory authority to place Fannie Mae into conservatorship, appointing FHFA as conservator.  In that capacity, FHFA has the authority to exercise all the rights of and pursue all the remedies available to Fannie Mae.  Fannie Mae remains under FHFA conservatorship today.

39.    FHFA concluded that Fannie Mae could not continue to operate safely and soundly to fulfill its critical public mission without significant action to address its impending insolvency.  A key component of the FHFA conservatorship was for the United States Department of the Treasury ("Treasury") to provide enormous financial support to Fannie Mae to enable Fannie Mae to continue to provide liquidity and stability to the mortgage market. Among other things, Treasury agreed to reimburse Fannie Mae on an ongoing basis for any amount by which Fannie Mae's liabilities exceeded its assets under a Senior Preferred Stock Purchase Agreement ("Fannie SPA").  Under the original terms of the Fannie SPA, Fannie Mae would owe Treasury dividends equal to 10% of the total amount of funds that it had obtained from Treasury but not repaid, called Treasury's liquidation preference.

40.    In order to cover the amount by which its liabilities exceeded its assets, Fannie Mae received $59.9 billion in 2009, $27.7 billion in 2010, and $24 billion in 2011, and $4.6 billion in 2012.

41.     As part of the Fannie SPA, Fannie Mae agreed to make quarterly dividend payments to Treasury.   Under the original terms of the SPA, the amount Fannie Mae owed in dividends each quarter was equal to 10% of the total amount of funds Fannie Mae had obtained from Treasury.   Fannie Mae's frequent inability to make those dividend payments, however, meant that it often borrowed more cash from Treasury just to pay the dividends, which in turn increased the dividends it was obligated to pay in future quarters.   In 2012, FHFA and Treasury adopted the Third Amendment to the Fannie SPA, which replaced the fixed 10% dividend with a formula by which Treasury was paid the amount by which Fannie Mae's net worth exceeded a $3 billion capital reserve until December 31, 2017, at which point the capital reserve would be $0.   The new dividend payments would not reduce Treasury's liquidation preference.   According to Treasury, the purpose of the change was to "ensure stability, fully capture[] financial benefits for taxpayers, and eliminate[] the need for Fannie Mae . . . to borrow from the Treasury Department to pay dividends."

42.     The practical result of the taxpayers' bailout of Fannie Mae is that every dollar of fraud against Fannie Mae was either an additional dollar of money that taxpayers had to provide to it or was a dollar taken away from taxpayers that Fannie Mae would have been required to pay to them under the terms of the bailout.

43.     As of September 30, 2017, Treasury had made a gross investment of more than $120 billion in Fannie Mae, with losses of more than $65 billion.

44.     Moreover, Treasury has committed to provide funding to Fannie Mae under certain circumstances if Fannie Mae has a net worth deficit.   As of September 2017, the maximum amount of remaining funding from Treasury under the agreement was $117.6 billion.

45.     The Government continues to invest in Fannie Mae.   In December 2017, Treasury

agreed to permit Fannie Mae to retain its annual $3 billion capital reserve as a further investment in Fannie Mae to help it cover income fluctuations in the normal course of business.  Treasury permitted Fannie Mae to keep that $3 billion reserve out of the dividends that would otherwise be due to Treasury in 2018 and beyond.

46.    The Government's funds remain invested in Fannie Mae, and Fannie Mae's obligations to repay the Government have not been satisfied.  Treasury owns Fannie Mae senior preferred stock and a warrant to purchase 79.9% of its common stock.  Under the arrangements with Treasury, Fannie Mae is not permitted to retain any net worth other than a $3 billion capital reserve, rebuild its capital position, or pay dividends or other distributions to any stockholders until it first satisfies its obligations to Treasury.  Treasury's investment in Fannie Mae, as of September 30, 2017, was reflected in a liquidation preference of $117.1 billion.  As Treasury Secretary Steven T. Mnuchin reiterated on December 2, 2017, in committing additional capital to Fannie Mae, "Treasury's first duty is to ensure that taxpayers are being protected."

47.    Moreover, on December 31, 2017, Fannie Mae again had a negative net worth requiring it to request an additional $3.7 billion from the Treasury.

### 2.    Fannie Mae's expenditure of federal funds to reimburse foreclosure expenses in furtherance of government interests

48.    Fannie Mae contracts with servicers, including the Defendants, to service mortgages held or securitized by Fannie Mae.  In the event that a servicer incurs foreclosure fees in servicing a Fannie Mae mortgage, the servicer is able to submit a claim to Fannie Mae for reimbursement of those costs.

49.    The reimbursements paid by Fannie Mae advance Government programs and interests.  As the Justice Department has previously explained, "[t]he enormous investment authorized by Congress to rescue the GSE's from anticipated failure, as well as the statutory

authority granted to and by the FHFA to place the GSEs in conservatorship, indicate that Congress considers these entities to be serving critical governmental interests."

50.     Moreover, because Treasury did not earmark its funds with particular limitations, some portion of the funds provided by Treasury's investment have been used by Fannie Mae to pay foreclosure expense claims, and some portion of those funds have been used to reimburse Fannie Mae for paying such claims.   And, because Treasury is generally entitled to specified dividends from Fannie Mae, above an agreed-upon net worth sum, any fraud or false claim paid by Fannie Mae decreases the dividend paid to Treasury.   As the Justice Department recently explained: "the GSEs' status as government-sponsored enterprises that have received nearly $200 billion in federal funding while under government conservatorship is sufficient under the FCA to establish that the United States provided some portion of the GSE payments."

### 3.     Relevant Fannie Mae contract provisions

#### a.     Servicers contract to do business with Fannie Mae.

51.     Servicers must be approved to do business with Fannie Mae.

52.     Each servicer, including both Defendants, is required to execute a Mortgage Selling and Servicing Contract ("MSSC") with Fannie Mae.   The MSSC establishes the basis legal relationship between a seller, servicer, or seller/servicer and Fannie Mae.   The MSSC incorporates by reference the Fannie Mae Servicing Guide.

#### b.     Servicers and law firms must provide the best value in foreclosure expenses for Fannie Mae.

53.     The MSSC requires servicers to retain competent, diligent, local legal counsel who are highly experienced in conducting foreclosures.   Under the MSSC, the servicer is responsible for monitoring all aspects of the performance of its foreclosure attorneys.

54.     Under the terms of the Fannie Mae contract, "[b]oth the law servicer and the law

firm must make every effort to reduce default-related foreclosure expenses." *See, e.g.*, Fannie

Mae Servicing Guide E-5-07 (Dec. 13, 2017).  To do so, the "servicer must attempt to minimize

the costs incurred from vendors utilized by law firms—such as auctioneers, process servers, title

companies, posting companies, and newspapers or other publications—by ensuring that all costs

are actual, reasonable, and necessary." *Id.*  "The servicer and law firm must regularly examine

the pricing offered by alternative vendors and negotiate for the best value from the vendor and

other qualified service providers."

55.     Fannie Mae has imposed heightened requirements on servicers and their attorneys

where the attorneys have an interest in other companies involved in the foreclosure process.

Specifically, Fannie Mae's contract terms have provided:

> The servicer must inquire whether its attorney . . . has any interest in any
> Affiliated Business Entity that provides services in connection with any
> foreclosure, bankruptcy, or eviction proceeding if the fees or costs of such
> services are reimbursable by Fannie Mae under this Guide.  An Affiliated
> Business Entity includes any entity in which any principal of the firm or any
> employee or family member (including in-laws) of any principal or employee of
> the firm has a direct or indirect decision-making, ownership, or financial interest.
>
> The servicer must require its attorney . . . to promptly disclose any such
> relationship or interest, and agree that any fees or expenses for such services do
> not exceed the customary and reasonable fees for comparable services in their
> jurisdiction.
>
> The servicer is responsible for monitoring the fees or expenses charged by any
> Affiliated Business Entity and Fannie Mae will require the servicer to reimburse
> Fannie Mae for any unreasonable or excessive fees or costs.

*See* Fannie Mae Servicing Guide, Part VIII, § 106.03 (Mar. 14, 2012); *see also* Fannie Mae

Servicing Guide, Part VIII, § 104.03 (Apr. 28, 2010).

### c.  Fannie Mae permits reimbursement requests for only necessary and reasonable foreclosure expenses.

56.     Fannie Mae's contracts permit reimbursement of only those costs that are actual,

reasonable, and necessary.  *See, e.g.*, Fannie Mae Servicing Guide, Part VIII, § 108.03 (Apr. 28, 2010) ("Specifically, Fannie Mae will reimburse the servicer for any of the following out-of-pocket costs that it pays to third-party vendors or the courts, as long as the costs are actual, reasonable, and necessary . . .."); *see also* Fannie Mae Servicing Guide E-5-07 ("all costs [must be] actual, reasonable, and necessary").

57.     Fannie Mae's contract prohibits reimbursement for costs that are unnecessary. *See, e.g.*, Fannie Mae Servicing Guide, Part VIII, § 108.03 (Apr. 28, 2010); Fannie Mae Servicing Guide E-5-07.

58.     Fannie Mae's contract likewise prohibits reimbursements for costs that are not reasonable.  *See, e.g.*, *id.*

59.     Moreover, the Fannie Mae contract requires servicers and foreclosure attorneys to minimize the costs incurred from third-party vendors by regularly examining the pricing offered by alternative vendors and negotiating for the best value from the vendor and other service providers.  *See* Fannie Mae Servicing Guide, Part VIII, § 108.03 (Apr. 28, 2010); Fannie Mae Servicing Guide E-5-07.

60.     Fannie Mae has contemplated that law firms with vendor affiliates may attempt to wrongfully recover inflated fees.  As a result, Fannie Mae has issued contract terms reiterating that any fees from law firm affiliates are limited to "customary and reasonable fees for comparable services in the[] jurisdiction."  *See* Fannie Mae Servicing Guide, Part VIII, § 106.03 (Mar. 14, 2012); Fannie Mae Servicing Guide, Part VIII, § 104.03 (Apr. 28, 2010).

### d.  The Fannie Mae contract obligates servicers to reimburse Fannie Mae for unreasonable and excessive foreclosure expenses.

61.     Fannie Mae's contract terms impose an obligation on servicers to "monitor[] the fees or expenses charged by" any law firm's affiliates.

62.    Under those terms, the servicer must repay Fannie Mae for any overpayments.

63.    Specifically, Fannie Mae's contract has required "the servicer to reimburse Fannie Mae for any unreasonable or excessive fees or costs." *See* Fannie Mae Servicing Guide, Part VIII, § 106.03 (Mar. 14, 2012).

**B.     Freddie Mac**

**1.     Freddie Mac's receipt of billions of dollars of federal funds**

64.    Congress originally chartered Freddie Mac in 1970 as a GSE intended to support the American housing market through the development of the secondary mortgage mark. Freddie Mac's mission is to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  As part of this mission, Freddie Mac invests in residential mortgage-backed securities.

65.    On September 6, 2008, pursuant to HERA, the Director of FHFA exercised FHFA's statutory authority to place Freddie Mac into conservatorship, appointing FHFA as conservator.  In that capacity, FHFA has the authority to exercise all the rights of and pursue all the remedies available to Freddie Mac.  Freddie Mac remains under FHFA conservatorship today.

66.    FHFA concluded that Freddie Mac could not continue to operate safely and soundly to fulfill its critical public mission without significant action to address its impending insolvency.  A key component of the FHFA conservatorship was for the Treasury to provide enormous financial support to Freddie Mac to enable Freddie Mac to continue to provide liquidity and stability to the mortgage market.  Among other things, Treasury agreed to reimburse Freddie Mac on an ongoing basis for any amount by which Freddie Mac's liabilities exceeded its assets under a Senior Preferred Stock Purchase Agreement ("Freddie SPA").  Under

the original terms of the Freddie SPA, Freddie Mac would owe Treasury dividends equal to 10% of the total amount of funds that it had obtained from Treasury but not repaid, called Treasury's liquidation preference.

67.     In order to cover the amount by which its liabilities exceeded its assets, Freddie Mac received $13.8 billion in 2008, $36.9 billion in 2009, $12.5 billion in 2010, $8 billion in 2011, and $165 million in 2012.

68.     As part of the SPA, Freddie Mac agreed to make quarterly dividend payments to Treasury.  Under the original terms of the SPA, the amount Freddie Mac owed in dividends each quarter was equal to 10% of the total amount of funds Freddie Mac had obtained from Treasury. Freddie Mac's frequent inability to make those dividend payments, however, meant that it often borrowed more cash from Treasury just to pay the dividends, which in turn increased the dividends it was obligated to pay in future quarters.  In 2012, FHFA and Treasury adopted the Third Amendment to the Freddie SPA, which replaced the fixed 10% dividend with a formula by which Treasury was paid the amount by which Freddie Mac's net worth exceeded a $3 billion capital reserve until December 31, 2017, at which point the capital reserve would be $0.  The new dividend payments would not reduce Treasury's liquidation preference.   According to Treasury, the purpose of the change was to "ensure stability, fully capture[] financial benefits for taxpayers, and eliminate[] the need for . . . Freddie Mac to borrow from the Treasury Department to pay dividends."

69.     The practical result of the taxpayers' bailout of Freddie Mac is that every dollar of fraud against Freddie Mac was either an additional dollar of money that taxpayers to provide to it or was a dollar taken away from taxpayers that Freddie Mac would have been required to pay to them under the terms of the bailout.

70.     As of September 30, 2017, Treasury had made a gross investment of more than $74 billion in Freddie Mac, with losses of more than $36 billion.

71.     Moreover, Treasury has made a commitment under a senior preferred stock purchase agreement to provide funding to Freddie Mac under certain circumstances if Freddie Mac has a net worth deficit.  As of September 2017, the maximum amount of remaining funding from Treasury under the agreement was $140.5 billion.

72.     The Government's funds remain invested in Freddie Mac, and Freddie Mac's obligations to repay the Government have not been satisfied.  Treasury owns Freddie Mac senior preferred stock and a warrant to purchase 79.9% of its common stock.  Under the arrangements with Treasury, Freddie Mac is not permitted to retain any net worth other than its capital reserve, rebuild its capital position, or pay dividends or other distributions to any stockholders until it first satisfies its obligations to Treasury.  Treasury's investment in Freddie Mac, as of September 30, 2017, was reflected in a liquidation preference of $72.3 billion.  As Treasury Secretary Steven T. Mnuchin reiterated on December 2, 2017, in committing additional capital to Freddie Mac, "Treasury's first duty is to ensure that taxpayers are being protected."

73.     Furthermore, the Government continues to invest in Freddie Mac.  In December 2017, Treasury agreed to permit a continued reserve of an annual $3 billion capital buffer as a further investment in Freddie Mac to help it cover income fluctuations in the normal course of business.  Treasury gave Freddie Mac that $3 billion buffer out of the dividends that would otherwise be due to Treasury in 2018 and beyond, in exchange for a $3 billion increase in Treasury's liquidation preference.

74.     Moreover, on December 31, 2017, Freddie Mac again had a negative net worth requiring it to draw $312 million more from the Treasury.

**2.      Freddie Mac's expenditure of federal funds to reimburse foreclosure expenses in furtherance of government interests**

75.      Freddie Mac contracts with servicers, including the Defendants, to service mortgages held or securitized by Freddie Mac.  In the event that a servicer incurs foreclosure fees in servicing a Freddie Mac mortgage, the servicer is able to submit a claim to Freddie Mac for reimbursement of those costs.

76.      The reimbursements paid by Freddie Mac advance Government programs and interests.  As the Justice Department has previously explained, "[t]he enormous investment authorized by Congress to rescue the GSE's from anticipated failure, as well as the statutory authority granted to and by the FHFA to place the GSEs in conservatorship, indicate that Congress considers these entities to be serving critical governmental interests."

77.      Moreover, because Treasury did not earmark its funds with particular limitations, some portion of the funds provided by Treasury's investment have been used by Freddie Mac to pay foreclosure expense claims, and some portion of those funds have been used to reimburse Freddie Mac for paying such claims.  And, because Treasury is generally entitled to specified dividends from Freddie Mac, above an agreed-upon net worth sum, any fraud or false claim paid by Freddie Mac decreases the dividend paid to Treasury.  As the Justice Department recently put it: "the GSEs' status as government-sponsored enterprises that have received nearly $200 billion in federal funding while under government conservatorship is sufficient under the FCA to establish that the United States provided some portion of the GSE payments."

**3.      Relevant Freddie Mac Contract Provisions**

**a.      Servicers contract to do business with Freddie Mac.**

78.      Servicers must be approved to do business with Freddie Mac.

79.      Each servicer, including each Defendant, is required to execute a contract with

Freddie Mac. The contract incorporates the Freddie Mac Single Family Seller/Service Guide by reference. The Freddie Mac Single-Family Seller/Servicer Guide "sets forth the Seller's responsibilities and obligations with respect to the Servicing of Mortgages." Freddie Mac Single-Family Seller/Servicer Guide Vol. II, 50.1 (April 14, 2011).

> **b.     Servicers must annually certify compliance with Freddie Mac rules, which include quality control for monitoring servicer reimbursement claims**.

80.     To obtain and maintain approval to do business with Freddie Mac, a servicer must submit an annual eligibility certification report to Freddie Mac. *See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. II, 50.2 (Nov. 1, 2011); Single-Family Form 16SF. The annual certification states, in sum and substance:

> Seller/Servicer agrees to comply with all of the Guide provisions and requirements, as they may be amended from time to time, as a condition of continuing eligibility.

> Seller/Servicer is in compliance with the provision set forth in the Guide, as they have been amended, including, but not limited to: Chapter 4, Seller/Servicer Eligibility . . ..

*See* Single-Family Form 16SF (2011); *see also* Freddie Mac Single-Family Seller/Servicer Guide, Vol. I, 4.9 (Oct. 15, 2014).

81.     The Freddie Mac Single-Family Seller/Servicer Guide "requires the Servicer to manage the foreclosure process to acquire clear and marketable title to the property in a cost-effective, expeditious, and efficient manner." Freddie Mac Single-Family Seller/Servicer Guide Vol II, 66.1 (Oct. 1, 2011).

82.     To qualify for Freddie Mac approval, a servicer must create and implement a quality control program in compliance with Freddie Mac requirements. *See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. I, 4.2 (Oct. 15, 2010). The development and implementation of a quality control program that complies with Freddie Mac requirements is a basic eligibility

requirement for Freddie Mac servicers.  *See, e.g.*, Freddie Mac, "Minimum Eligibility Requirements," *at* https://ww3.freddiemac.com/ds1/singlefamily/beourcustomer.nsf/ frmEligReq?OpenForm.  Accordingly, as a precondition of approval to become a Freddie Mac servicer, Freddie Mac requires each servicer to have an acceptable quality control program.

83.    A mandatory Freddie Mac quality control requirement is that servicers monitor, evaluate, and approve all parties to whom servicing functions are outsourced or assigned, including any foreclosure activities.  *See* Freddie Mac Single-Family Seller/Servicer Guide, Vol. II, 57.2(b) (Jan. 1, 2015).

84.    Freddie Mac likewise requires that servicers ensure that any law firms they retain are free of any "conflict of interest or potential conflict of interest."  Freddie Mac Single-Family Seller/Service Guide, Vol. II, 69.3(y) (June 1, 2013).  To that end, Freddie Mac's rules state that the servicer "must require the firm to disclose the identity of, and relationship with any entities the firm relies upon to provide third-party support functions performed on the Servicer's behalf, including, but not limited to, title searches, title insurance, posting, publication, and process services."  *Id.* 69.3(z).  Freddie Mac also requires that servicers "require the firm to disclose whether the firm has a process to select and regularly review costs and performance of vendors of related sources to ensure competitive pricing and high quality."  *Id.*

85.    Freddie Mac requires services to "develop and have in place policies and procedures regarding oversight and compliance of firms handling Freddie Mac Default Legal Matters" and states that servicers "must have policies and procedures reasonably designed to ensure that firms handling Freddie Mac Default Matters are in compliance with . . . the applicable provisions of the Guide, and applicable law."  *Id.* 69.11(a).  "The Servicer's ongoing compliance monitoring must address the following minimum elements: . . . firm performance

and processes necessary to ensure Servicer's compliance with applicable Guide requirements."

*Id.*

### c. Freddie Mac permits reimbursement requests for only reasonable and customary foreclosure expenses.

86.     Freddie Mac's contracts permit reimbursement of only that costs that are actual, reasonable, and necessary.  *See, e.g.*, Freddie Mac Single-Family Seller/Servicer Guide, 9701.11 (Mar. 9, 2016) ("All foreclosure and related legal fees and costs must be reasonable and comparable to those customarily charged in the area where the property is located."); Freddie Mac Single-Family Seller/Servicer Guide Vol II, 71.19 (October 10, 2014) ("All foreclosure and related legal fees and costs must be reasonable and comparable to those charged in the area where the property is located.");  Freddie Mac Single-Family Seller/Servicer Guide Bulletin Number 2013-6 (April 15, 2013) ("As a reminder, Servicers must ensure that attorney fees and costs incurred are reasonable and customary for the area in which the property is located."); Freddie Mac Single-Family Seller/Servicer Guide Vol II, 66.15.2 (October 1, 2011) ("Foreclosure counsel or trustee fees must be reasonable and comparable to those customarily charged in the area where the property is located.").

## C.     FHA

87.     FHA is the largest insurer of residential mortgages in the world.  Pursuant to the National Housing Act of 1934, FHA offers various mortgage insurance programs.  Through these programs, FHA insures approved lenders against losses on mortgage loans, including losses incurred in foreclosure proceedings.  FHA mortgage insurance may be granted on mortgages used to purchase homes, improve homes, or to refinance existing mortgages.  FHA's single family mortgage programs cover owner-occupied principal residences.

88.     FHA mortgage insurance programs help low-income and moderate-income families become homeowners by lowering some of the costs of their mortgage loans.  FHA mortgage insurance encourages lenders to make loans to otherwise creditworthy borrowers and projects that might not be able to meet conventional underwriting requirements by protecting the lenders against defaults on mortgages, including the costs of foreclosing on those defaults.

89.     FHA mortgage insurance provides lenders with protection against losses when borrowers default on mortgage loans insured by FHA.  *See generally* 12 U.S.C. § 1710; 24 C.F.R., Part 203.  In the event that a borrower defaults on an FHA-insured mortgage, the holder of the mortgage is able to submit a claim to HUD for the costs associated with the defaulted mortgage.  *See, e.g.*, Form HUD 27011.

**1.      FHA servicers must annually certify compliance with HUD rules, which include quality control for monitoring servicing reimbursement claims.**

90.     Under HUD rules, only FHA-approved lenders may service FHA-insured loans. 24 C.F.R. § 203.502; Mortgagee Letter 2009-42.  In order to obtain initial FHA approval, servicers must certify, *inter alia*, that "with the submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to . . . HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies . . ."  FHA Lender Initial Approval Certification.

91.     To obtain and maintain FHA approval, a servicer must submit an annual certification to HUD.  *See* HUD Handbook 4060.1, 1-3; HUD Handbook 4060.1, 4-1.  The annual certification states, in sum and substance:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies.  I certify

that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

92.     Submitting truthful annual certifications to HUD is a condition of obtaining and maintaining status as an FHA-approved servicer and thereby applying for and obtaining insurance benefits to cover servicing-related expenses, including foreclosure costs and fees.  The annual certification requires compliance with the eligibility criteria for services, which include compliance with HUD rules concerning servicers' quality control.

93.     To qualify for FHA approval, a servicer must create and implement a quality control plan that ensures compliance with HUD rules.   *See* 24 C.F.R. § 202.5(h); HUD Handbook 4060.1, 1-15, 3-2(12), 7-1.  The development and implementation of a quality control plan is a basic eligibility requirement for FHA-approved servicers.  *See* 24 C.F.R. § 202.5(h). HUD has determined that FHA servicing can be offered only if participating servicers have acceptable quality control plans.  Accordingly, as a precondition of FHA-approval for servicing, HUD will require each servicer to have an acceptable quality control plan.

94.     An FHA-approved servicer must have a fully functioning quality control program from the date of its initial FHA approval until final surrender or termination of its approval. Thus, a servicer must implement and continuously have in place a quality control plan as a condition of receiving and maintaining FHA approval.  *See* HUD Handbook 4060.1, 7-1.

95.     The purposes of quality control plans include ensuring that the procedures used by servicers in the foreclosure process comply with HUD rules, protecting HUD against unacceptable risk, and guarding HUD against the submission of erroneous or fraudulent claims for FHA insurance benefits.  *See* HUD Handbook 4060.1, 7-2.

96.     A mandatory HUD quality control requirement is that servicers review all claims for insurance benefits.  Specifically, HUD rules provide that servicers must determine that insurance claims are properly calculated and claim amounts are fully supported, and must thoroughly review the claim to verify that supporting documentation exists for all information entered on the claim form.  In addition, servicers must ensure that sufficient controls exist to assure that the preparation of insurance claims are complete and accurate, in order to minimize losses to HUD.  *See* HUD Handbook 4060.1, 1-15.

97.     Another mandatory HUD quality control requirement is that servicers take steps to ensure that unallowable foreclosure processing fees are not included in insurance claims. Specifically, HUD rules provide that servicers must review all aspects of their operations to ensure that all FHA requirements are met, including FHA rules regarding reimbursement for foreclosure processing fees and charges.  *See* HUD Handbook 4060.1, 7-10.  HUD rules further provide that servicers must implement, as a mandatory component of quality control, sufficient controls to ensure that claims for insurance benefits are properly prepared, calculated, supported, and submitted, including claims for foreclosure costs and fees.  *See* HUD Handbook 4060.1, 7-12.

98.     Another HUD quality control requirement is that banks "ensure that their contractors, agents, and loan correspondents are acceptable to FHA and operate in compliance with FHA requirements."  *See* HUD Handbook 4060.1, 7-3.

**2.     HUD rules permit reimbursement for servicing costs only to the extent that the costs are necessary, reasonable, and customary in the geographical area.**

99.     HUD rules authorize servicer reimbursement of certain foreclosure costs and costs of acquiring a property by other means, including the costs of conveying title to HUD.

100.    Servicers may claim such reimbursements by submitting a Single-Family Application for Insurance Benefits, Form HUD 27011.  Box 307 of Form HUD 27011 provides for the itemization of foreclosure and/or acquisition, conveyance and other costs.  The servicer must sign a certification on the Form HUD 27011 that "the statements and information contained hereon . . . are true and correct."  *See* Form HUD 27011.

101.    HUD rules provide that the following costs are allowable:

    a.   Fees that must be paid to public officials;

    b.   Costs that are required by law, such as private service of process; and

    c.   Fees and costs that are necessarily incurred and are reasonable and customary in the area.

*See* HUD Handbook 4330.4, 2-15(A).

102.    By contrast, HUD rules expressly provide that any of the following costs are unallowable, and that HUD will not reimburse a servicer for:

    a.   Fees and costs that exceed reasonable and customary fees for the area;

    b.   Costs that are not necessarily incurred or are required because of dilatory service, such as courier service or express mail or property inspection by attorneys; and

    c.   Costs that are overhead items such as postage, telephone, duplicating or collection services, all of which should be included in the attorney's or trustee's fees.

*See* HUD Handbook 4330.4, 2-15(B).

103.    HUD rules expressly prohibit banks from listing any unallowable costs on their application for insurance benefits as either attorneys' fees or foreclosure-related costs.  HUD

Handbook 4330.4, 1-21 ("Costs paid by the attorney and reimbursed by the mortgagee are shown in Item 307.  If the attorney bills the mortgagee for unallowable costs, they should not be listed in either item.").

**3.**      **HUD rules obligate servicers to reimburse HUD for overpayments.**

104.    HUD rules likewise obligate banks to "promptly reimburse HUD for any amount overpaid because of incorrect, unsupported or inappropriate information" they provide. HUD Handbook 4330.4, 1-28.

## III.    DEFENDANTS' SCHEMES

105.    Defendants participated in a scheme that overcharged the GSEs and FHA for foreclosure services, such as performing title searches and serving process on foreclosure defendants.

106.    As described in Part A below, law firms, such as the Rosicki Firm and the McCabe Firm, created subsidiary corporations to handle and bill for title searches, service of process, the arrangement of publication of legal notices, and related services.  Under that business model, such affiliated subsidiaries, such as the Rosicki Firm's affiliates, Paramount and Enterprise, generated illegal and excessive charges for foreclosure services, which the law firms passed along to their clients, including the Defendants.

107.    This business model generated substantial profits for foreclosure services vendors (and the law firms that often owned them) because the Defendants paid for unnecessary fees (*e.g.*, for unnecessary personal service) and because the Defendants paid excessive fees, well above available market rates.  On information and belief, the GSEs and FHA ultimately reimbursed the Defendants for many of these unnecessary and excessive fees.

108.    This business model was an important source of revenue for the Rosicki Firm and

other foreclosure law firms because Fannie Mae and other clients effectively monitored, capped, and limited reimbursements for attorneys' fees – but not costs.  On information and belief, that focus on attorneys' fees led foreclosure law firms, like the Rosicki Firm, to find other ways to profit from foreclosure matters.  The business model described allowed the Rosicki Firm and the McCabe Firm to profit from foreclosure work, despite the limitations on attorneys' fees.

109.    As described in Part B below, on information and belief, the Defendants abdicated their duties to the GSEs and FHA in a variety of ways, and knowingly or recklessly made false claims for unallowable reimbursements.  The Defendants, upon and information and belief, submitted claims for reimbursement without making any real effort to reduce foreclosure expenses, as they had contracted with Fannie Mae, and without performing the quality control functions required by Freddie Mac and FHA.  Nor, on information and belief, did the Defendants limit their claims for reimbursement to the payment terms set out by the GSEs' contracts or FHA's payment rules; rather, they wrongly claimed reimbursement for all foreclosure expenses, no matter how unreasonable or unnecessary.  This wholesale failure to monitor, audit, and control foreclosure fees created the opportunity for law firms and their affiliates, as well as other vendors, to overcharge for those fees, which were passed on to the GSEs and FHA.

110.    If the Defendants had monitored and refused to pay unreasonable and unnecessary fees, neither the Rosicki Firm's affiliates nor other vendors would have been able to continue billing the Defendants – and ultimately, the GSEs and FHA – for unnecessary and unreasonable foreclosure expenses.

111.    The Defendants had few financial incentives to monitor foreclosure fees because the Defendants regularly passed those fees onto the GSEs and FHA.  On information and belief, the GSEs and FHA reimbursed the Defendants for most of these fees in situations where the

mortgage was ultimately foreclosed upon; and, in most other cases, homeowners reimbursed the Defendants directly when the mortgage was reinstated, modified, or brought current through bankruptcy proceedings.

112.    On information and belief, the Defendants perpetuated this scheme over multiple years by falsely certifying to the GSEs and FHA that their reimbursement claims were accurate, and that they were in compliance with contractual and program rules on an annual basis, despite their systematic overstatement of foreclosure expense reimbursements.

113.    On information and belief, as a result of their wrongful conduct, the Defendants obtained millions of dollars of reimbursements from the GSEs and FHA, including reimbursements for illegal and excessive foreclosure fees relating to foreclosures across the United States.

**A.     The Rosicki and McCabe Entities**

**1.     The Rosicki Entities**

114.    The Rosicki Firm and/or its principals have an interest in and control over Paramount (and had an interest in and control over Paramount's predecessor entity, Threshold) and Enterprise.  The Chief Executive Officer of both Paramount (and Threshold before it) and Enterprise is Thomas Rosicki, a principal and named partner of the Rosicki Firm.  The Rosicki Firm contracts with Paramount and Enterprise for the Rosicki Firm's title and service work throughout the State of New York.  The Rosicki Firm, Paramount, Threshold, and Enterprise are collectively referred to as the "Rosicki Entities."

115.    Paramount (and Threshold before it) and Enterprise systematically overbill the clients of the Rosicki Firm – including, ultimately, Fannie Mae, Freddie Mac, and FHA – for foreclosure costs, in violation of the GSEs' contract provisions and FHA rules as set forth above.

116.    Enterprise has regularly billed for unnecessary services, including:

    a.    Service upon the New York State Department of Taxation and Finance, despite the absence any tax lien;

    b.    Service upon judgment debtors with names similar to the foreclosure defendant, even though the judgment debtors' names were irreconcilable with that of the foreclosure defendant (*e.g.*, because of different middle names, disparate locations, etc.);

    c.    Ineffective and worthless service upon "John Doe" defendants; and

    d.    Services that are part of law firm overhead expenses, such as court filings.

117.    The Rosicki Firm contracts for these unnecessary services from Enterprise for the primary purpose of generating fees for Enterprise.

118.    These services are not reimbursable by the GSEs or FHA.

119.    Similarly, Enterprise regularly bills for services that should be part of the Rosicki Firm's fee, such as delivering pleadings, affidavits, and other filings to court.  These services are properly and customarily provided by law firms, not servicers.  Moreover, these delivery services are often unnecessary because many of the filings could be made by mail

120.    The Rosicki Firm contracts for these services from Enterprise for the primary purpose of generating fees for Enterprise.

121.    The Rosicki Firm also contracts for these services to avoid performing the work that it is required to perform under the applicable GSE contracts and FHA rules in order to earn the legal fees that it charges to the Defendants.  On information and belief, the Rosicki Firm does not decrease its legal fees in cases where Enterprise handles the work required of the Rosicki Firm.  Accordingly, by offloading the tasks required of the Rosicki Firm onto Enterprise, the

Rosicki Firm generates profits in two ways: (1) by generating fees for Enterprise, and (2) by avoiding labor and other overhead expenses that are supposed to be included in the Rosicki Firm's legal fees.

122.    These services are not reimbursable by the GSEs or by FHA.

123.    In addition, to billing for unnecessary services and services included in attorney overhead, both Paramount and Enterprise regularly bill at excessive rates for services including:

   a.    Title searches well above market rates (*e.g.*, at $495, despite market rates between $100 - $250);

   b.    Personal service well above market rates (*e.g.*, at $125, despite market rates of approximately $20 - $40, and full charges for additional defendants residing at the same address);

   c.    Delivery upon the New York Secretary of State well above market rates (*e.g.*, at $75, despite market rates of approximately $20); and

   d.    Mailings to "John Doe" defendants at substantial sums (*e.g.*, $50) where the minimal work involved consisted of merely sending a summons and complaint by mail.

124.    The Rosicki Firm contracts for these unnecessary services from Paramount (and Threshold before it) and Enterprise for the primary purpose of generating fees for Paramount (and Threshold before it) and Enterprise.

125.    These services are not reimbursable by the GSEs or FHA.

126.    Moreover, Enterprise does not provide many of these services itself.  Instead, with the assent of the Rosicki Firm, Enterprise often contracts with other entities to conduct services, such as service of process, and then simply marks up the bill before seeking reimbursement.

Although the Rosicki Firm could readily contract directly with entities serving process, it chooses to contract with Enterprise instead, in order to generate profits from allowing Enterprise to mark up the services bills of other entities.

127.    Likewise, on information and belief, the Rosicki Firm contracts with Adelphi Legal Publishing Corp. ("Adelphi") for the publication of legal notices, which Adelphi does not publish itself.  Instead, on information and belief, with the assent of the Rosicki Firm, Adelphi contracts with legitimate publications for the publication of legal notice, and then Adelphi simply marks up the bill.  On information and belief, although the Rosicki Firm could readily contract directly with entities publishing legal notices, it chooses to contract with Adelphi instead, in order to generate profits from allowing Adelphi to mark up the bills of legitimate publications. On information and belief, Adelphi is owned and/or controlled by the Rosicki Firm and, prior to using Adelphi, the Rosicki Firm used Whittiker Legal Publishing Corp. ("Whittiker") as part of the same scheme.  On information and belief, Whittiker, like Adelphi, is owned and/or controlled by the Rosicki Firm.

128.    On information and belief, the Rosicki Entities billed the Defendants for these unnecessary and excessive charges with the intention, expectation, knowledge, and belief that the Defendants would seek reimbursement from the GSEs and FHA for these charges.

129.    The conduct of the Rosicki Entities described above caused the Government, through Fannie Mae, Freddie Mac, and FHA, to pay false and fraudulent claims.

130.    Other foreclosure service vendors throughout the country, including affiliates of many GSE and FHA servicers' law firms, have engaged in similar schemes.

**2.      The McCabe Entities**

131.    The McCabe Firm, AOSS, and REO (the "McCabe Entities") have a business

model similar to that of the Rosicki Entities.

132.    The McCabe Firm and/or its principals or agents have an interest in and control over AOSS and REO.  The Chairman or Chief Executive Officer of AOSS is Terrence McCabe, a principle and named partner of the McCabe Firm, and AOSS shares office space with the McCabe Firm.   REO's officers are all, on information and belief, spouses of partners of the McCabe Firm:  President Elizabeth McCabe is, on information and belief, the spouse of partner Terrence McCabe; Secretary Judy Conway is, on information and belief, the spouse of partner Edward D. Conway; Treasurer Anthony Gairo is, on information and belief, the spouse of partner Margaret Gairo; and Vice President Weisberg is, on information and belief, the spouse of partner Marc Weisberg.  REO shares office space with the McCabe Firm.

133.    The McCabe Firm contracts with AOSS and REO for the McCabe Firm's title and service work for foreclosure proceedings.

134.    On information and belief, AOSS and REO have systematically billed the clients of the McCabe Firm – and ultimately the GSEs and FHA – at excessive rates for services including:

        a.    Title searches well above market rates (*e.g.*, at more than $450, despite market rates between $100 - $250); and

        b.    Personal service well above market rates (*e.g.*, at more than $200, despite market rates of approximately $40).

135.    On information and belief, the McCabe Firm contracts for services at excessive rates from AOSS and REO for the primary purpose of generating fees for AOSS and REO.

136.    The McCabe Firm also contracts for these services to avoid performing the work that it is required to perform under the applicable GSE contracts and FHA rules in order to earn

the legal fees that it charges to the Defendants.  On information and belief, the McCabe Firm does not decrease its legal fees in cases where its affiliates handle the work required of the McCabe Firm.  Accordingly, by offloading the tasks required of the McCabe Firm onto its affiliates, the McCabe Firm generates profits in two ways: (1) by generating fees for its affiliates, and (2) by avoiding labor and other overhead expenses that are supposed to be included in the McCabe Firm's legal fees.

137.    These services are not reimbursable by Government programs, including Fannie Mae and FHA.

138.    Moreover, AOSS does not provide many of these services itself.  Instead, with the assent of the McCabe Firm, AOSS often contracts with other entities to conduct services, such as service of process, and then simply marks up the bill before seeking reimbursement.  Although the McCabe Firm could readily contract directly with entities serving process, it chooses to contract with AOSS instead, in order to generate profits from allowing AOSS to mark up the services bills of other entities.

139.    On information and belief, the McCabe Entities billed the Defendants for these unnecessary and excessive charges with the intention, expectation, knowledge, and belief that the Defendants would seek reimbursement from the Government for these charges.

140.    On information and belief, the conduct of the McCabe Entities described above caused the Government, through Fannie Mae, Freddie Mac, and FHA, to pay false and fraudulent claims.

**D.      The Defendants**

       **1.  The Defendants submitted false claims to the GSEs and FHA.**

141.    The Defendants failed to comply with the GSE's contractual requirements and

FHA's rules regarding foreclosure expenses, and repeatedly, on information and belief, submitted overstated claims for reimbursement to the GSEs and FHA.

142.    The Defendants, on information and belief, failed to "make every effort" to reduce default-related legal expenses.  Contrary to their obligations to Fannie Mae, they not "regularly examine the pricing offered by alternative vendors and negotiate the for the best value."  In fact, on information and belief, the Defendants never did so.

143.    Nor, on information and belief, did the Defendants "attempt to minimize the costs incurred from vendors utilized by the law firm – such as auctioneers, process servers, title companies, posting companies, and newspapers or other publications – by ensuring that all costs are actual, reasonable, and necessary."

144.    Likewise, the Defendants did not exercise quality control over foreclosure expenses, despite their annual certifications to Freddie Mac and/or FHA.

145.    Rather, on information and belief, the Defendants repeatedly submitted false and inflated sums to the GSEs and FHA for reimbursement.  These sums included unallowable foreclosure expenses that were either unreasonable, unnecessary, or both.  As a result, the Defendants received reimbursements from the GSEs and FHA to which the Defendants were not entitled.

146.    On information and belief, the Defendants have submitted false claims without undertaking any process to assess whether foreclosure expenses were reasonable or necessary. The Defendants simply sought reimbursement for all foreclosure expenses, whether reasonable and necessary or not.

147.    On information and belief, the Defendants had to ignore various red flags that indicated that foreclosure expenses were unnecessary or excessive.

148.    For instance, vendors now regularly charge for services (such as filing pleadings and delivering papers to court) that they did not regularly bill in past foreclosure cases, when the law firms were not using affiliated companies.  Over time, vendors began to charge for such services because they could capture the profits generated and because, by offloading attorney tasks onto affiliated companies, the law firms avoid labor and other overhead expenses that are supposed to be included in their legal fees.  These new charges were a red flag that the Defendants had to ignore to continue seeking reimbursements for all vendor fees.

149.    Moreover, the rates charged by vendors, including the Rosicki Entities, increased dramatically over time, despite the related attorneys' fees decreasing or remaining stable.  Those charges have increased because vendors profit from the higher charges and because the law firms, such as the Rosicki Firm, control decision-making regarding the hiring of other foreclosure services vendors.  These inflated charges were a red flag that the Defendants had to ignore to continue seeking reimbursements for all vendor fees.

150.    In addition, Relator repeatedly brought the illegal and excessive nature of affiliates' fees to the attention of various bank servicers, including Defendant Chase, as well as to their agents, and the Rosicki Firm.  Yet, upon information and belief, Chase has taken no action.  Such complaints were red flags that Chase had to ignore to continue seeking reimbursements for all vendor fees.

151.    Further, on information and belief, Defendants learned of an investigation by the U.S. Department of Justice into this very issue.  As early as 2013, the U.S. Department of Justice notified certain banks (other than Defendants) that it was investigating overcharges to the GSEs and FHA for foreclosure expenses.  On information and belief, that notice emphasized the potential for illegal and excessive foreclosure expenses with many vendors, and, in particular,

with affiliates of law firms.   On information and belief, the Defendants learned of these investigations at the time.  Nevertheless, none of the Defendants, on information and belief, took action to review foreclosure expenses after learning of the Government's investigation.  The Justice Department's investigation was a red flag that the Defendants had to ignore to continue seeking reimbursements for all vendor fees.

152.   In addition, on July 1, 2014, the United States Attorney for the Southern District of New York issued a press release announcing that a servicer admitted to failing to "oversee the reasonableness of foreclosure-related charges" to a GSE and FHA, "contrary to program requirements and [the servicer's] certifications that it had done so."  The press release explained that the servicer had "accepted responsibility for failing to create or maintain systems to review fees and charges submitted by outside counsel and other third-party providers," which the servicer "then submitted to FHA and Fannie Mae for reimbursement without the requisite oversight and review."  That servicer "agreed to pay the Government $10 million to resolve its liability."  Preet Bharara, the United States Attorney, announced that the servicer "failed to live up to its legal obligation to monitor and review fees and expenses it was submitting to FHA and Fannie Mae for reimbursement."  And Michael P. Stephens, the FHFA Acting Inspector General, stated that the defendant "had a responsibility, as a servicer, to have controls in place which ensured the fees and charges submitted to Fannie Mae were appropriate and reasonable.  Their lack of controls showed gross neglect and an abject failure to servicer their customers, FHA and Fannie Mae, and therefore the taxpayers."   The press release also explained that, under applicable rules, servicers had an obligation "to ensure that all costs submitted to Fannie Mae for reimbursement were reasonable, customary, and necessary."   This press release – and its description of a similar "lack of controls" as those existing at the Defendants as "gross neglect

and an abject failure – was an additional red flag that the Defendants had to ignore to continue seeking reimbursements for all vendor fees.

153.    Moreover, on information and belief, law firms often used unaffiliated vendors with no geographic proximity to the site of a foreclosure, which resulted in costs substantially higher than the costs charged by local vendors; and, in many instances, vendors simply subcontracted with local vendors, resulting in an unnecessary markup.   On information and belief, the Defendants then sought reimbursement from the GSEs and FHA for these inflated foreclosure fees.   These out-of-jurisdiction vendors with higher rates were also red flags that the Defendants had to ignore to continue seeking reimbursements for all vendor fees.

154.    If the Defendants had complied with the applicable GSE contract terms, or the applicable FHA rules, they would have readily discovered that many foreclosure fees were neither reasonable nor customary, as they do not reflect market rates.   On information and belief, the Defendants failed to do so, despite their obligations to do so.

155.    The Defendants' failures as described above were national in scope.

156.    The affiliate model exists throughout the country.   The McCabe Entities, for instance, hold themselves out as representing the mortgage banking industry in the Mid-Atlantic region, including in foreclosure matters in Pennsylvania, New York, New Jersey, Maryland, Virginia, and the District of Columbia.   The law firm of Steven J. Baum, P.C., a major New York foreclosure firm for much of the relevant time period, created such a profitable affiliate model that it was able, on information and belief, to spin off the entity in a reportedly $60 million sale to private investors.   In Colorado, on information and belief, various law firms including Aronowitz & Mecklenburg (together with its predecessors and successors, such as Aronowitz and Ford LLP, the "Aronowitz Firm") have affiliated vendors.   On the West Coast, on

information and belief, the firm Routh, Crabtree & Olsen, P.S., has affiliated vendors, and, in Michigan, Schneiderman & Sherman has an affiliated title company.  In the South, for instance, Brock & Scott PLLC represents itself as handling foreclosures for HUD, Fannie Mae, and Freddie Mac loans throughout Florida, Georgia, Tennessee, South Carolina, North Carolina, Virginia, and Maryland; and Brock & Scott represents that it, too, uses an affiliated title service company.  Other law firms with affiliates are described in the examples below.

157.    The affiliate model has become particularly pervasive for foreclosure law firms taking advantage of the reimbursement arrangements of the GSEs and FHA.  Approximately 75% of law firms handling Fannie Mae foreclosures, for instance, appear to have affiliate vendors.

158.    On information and belief, the majority of the Defendants' law firms handling foreclosure actions have engaged in similar affiliate schemes.

159.    The Defendants either knew of or recklessly disregarded the existence of these affiliate relationships on a nationwide basis and the dangerous incentives those relationships created.

160.    The Defendants' nationwide failures related to foreclosure expenses generated by law firms and vendors across the country.  For instance, on information and belief, in New York, law firms without affiliates regularly billed the Defendants for illegal and excessive costs, which the Defendants included in claims for reimbursement from the GSEs and FHA.  Likewise, on information and belief, in Florida, the Law Offices of David J. Stern regularly overcharged for service of process.  On information and belief, these patterns existed throughout the country, and the Defendants failed to monitor law firms and their vendors throughout the country, whether those vendors were affiliates or otherwise.

161.    On information and belief, the conduct of the Defendants described above caused the Government, through the GSEs and FHA, to pay false and fraudulent claims.

162.    On information and belief, the examples below are illustrative of the manner in which the Defendants engaged in wrongdoing:

a.    <u>The Van Cortlandt Park Avenue Property Example (Bank of America)</u>

163.    Fannie Mae held a mortgage on a property on Van Cortlandt Park Avenue in Yonkers, New York (the "Van Cortlandt Park Avenue Property").  Fannie Mae contracted with Bank of America to service the mortgage on the Van Cortlandt Park Avenue Property.

164.    Under contract with Fannie Mae, Bank of America engaged the law firm of Shapiro DiCaro & Barak LLC (the "Shapiro Firm") to handle foreclosure proceedings as to the Van Cortlandt Park Avenue Property.

165.    On information and belief, the Shapiro Firm charged approximately $367 for title work on the Van Cortlandt Park Avenue Property.  This amount was well above market rates, which were approximately $100-$250.

166.    On information and belief, the Shapiro Firm charged approximately $1290 for service-of-process work on the Van Cortlandt Park Avenue Property, including approximately $320 each for personal service on each defendant served in the foreclosure case.  This amount was well above the market rate, which was approximately $20-$40 per person.

167.    On information and belief, the Shapiro Firm's service-of-process charges included charges that were unnecessary, such as $195 in investigation charges in connection with ascertaining the current address of one of the borrowers – which address was already reflected on the pre-foreclosure notices that Bank of America had previously mailed to the borrower.

168.    On information and belief, the Shapiro Firm charged for services that were part of the Firm's or the vendor's administrative overhead or included within the Firm's attorney fee, such as serving the Request for Judicial Intervention (RJI), filing the affidavits of service on the court's electronic filing system, and making copies.

169.    On information and belief, the Shapiro Firm submitted the foregoing title and service-of-process invoices, with unreasonable foreclosure charges, to Bank of America.

170.    On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which were not; rather, sometime after November 2014, Bank of America overstated its reimbursement claim, seeking the whole amount from Fannie Mae.

171.    On information and belief, Fannie Mae paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

### b.    The Edinburgh Drive Property Example (Chase)

172.    Freddie Mac held a mortgage on a property on Edinburgh Drive in Peekskill, New York (the "Edinburgh Drive Property").   Freddie Mac contracted with Chase to service the mortgage on the Edinburgh Drive Property.

173.    Under contract with Freddie Mac, Chase engaged the Rosicki Firm to handle foreclosure proceedings as to the Edinburgh Drive Property.

174.    On information and belief, the Rosicki Firm arranged with its affiliated title vendor, Paramount, to bill for title searches relating to the Edinburgh Drive Property.

175.    On information and belief, Paramount invoiced the Rosicki Firm approximately $655 for title searches relating to the Edinburgh Drive Property.   This amount is well above market rates, which were approximately $100-$250.   In fact, on information and belief,

Paramount hired another company to conduct the title search at market rates and simply marked up those invoices to approximately $655.

176.     On information and belief, the Rosicki Firm contracted with its service-of-process affiliate, Enterprise, to bill for service of process on the foreclosure defendants.

177.     On information and belief, Enterprise invoiced the Rosicki Firm approximately $85 each for personal service on each defendant at the Edinburgh Drive Property, two of whom were served at the same address.  This amount was well above market rates, which were between $20-$40 per person.  In fact, on information and belief, Enterprise hired another process service vendor to serve each person at market rates and marked up those invoices to approximately $85 per defendant.

178.     On information and belief, the Rosicki Firm submitted the foregoing title and service-of-process invoices, with unreasonable foreclosure charges, to Chase.

179.     On information and belief, Chase undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which were not; rather, sometime after March 2016, Chase overstated its reimbursement claim, seeking the whole amount from Freddie Mac.

180.     On information and belief, Freddie Mac paid Chase's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

c.     The Antelope Drive Property Example (Bank of America)

181.     FHA insured a mortgage on a property on Antelope Drive in Deltona, Florida (the "Antelope Drive Property").  Bank of America serviced the mortgage on the Antelope Drive Property.

182.     Bank of America engaged the Law Offices of David J. Stern (the "Stern Firm") to

handle foreclosure proceedings as to the Antelope Drive Property.

183.    On information and belief, the Stern Firm charged $375 for title work on the Antelope Drive Property.  This amount was well above market rates.  In fact, on information and belief, the title work was completed by an unaffiliated title company for between $100 and $150, and then marked up.

184.    On information and belief, the Stern Firm submitted these invoices, with unreasonable foreclosure charges, to Bank of America.

185.    On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after March 2012, Bank of America overstated its reimbursement claim, seeking the whole amount from FHA.

186.    On information and belief, FHA paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

### d.   The Roundtree Court Property Example (Chase)

187.    Freddie Mac held a mortgage on a property on Roundtree Court in Beacon, New York (the "Roundtree Court Property").  Freddie Mac contracted with Chase to service the mortgage on the Roundtree Court Property.

188.    Under contract with Freddie Mac, Chase engaged the McCabe Firm to handle foreclosure proceedings as to the Roundtree Court Property.

189.    On information and belief, the McCabe Firm contracted with its affiliated title search vendor, REO, to bill for title searches relating to the Roundtree Court Property.

190.    On information and belief, REO invoiced the McCabe Firm approximately $445 for title searches relating to the Roundtree Court Property.  This amount was well above market

rates, which were approximately $100-$250.  In fact, on information and belief, REO hired another company to conduct the title search at market rates and simply marked up those invoices to approximately $445 or more.

191.    On information and belief, the McCabe Firm contracted with its affiliated service-of-process vendor, AOSS, to bill for service of process on the foreclosure defendants.

192.    On information and belief, AOSS invoiced the McCabe Firm approximately $133 each for personal service on each defendant at the Roundtree Court Property.  This amount was well above market rates, which were between $20-$40 per person.  On information and belief, AOSS hired another process service vendor to serve each person at market rates and simply marked up those invoices.

193.    On information and belief, the McCabe Firm submitted these invoices, with unreasonable foreclosure charges, to Chase.

194.    On information and belief, Chase undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after March 2016, Chase overstated its reimbursement claim, seeking the whole amount from Freddie Mac.

195.    On information and belief, Freddie Mac paid Chase's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

### e.    The Glenwood Avenue Property Example (Bank of America)

196.    Fannie Mae held a mortgage on a property on Glenwood Avenue in Yonkers, New York (the "Glenwood Avenue Property").  Fannie Mae contracted with Bank of America to service the mortgage on the Glenwood Avenue Property.

197.    Under contract with Fannie Mae, Bank of America engaged a New York law firm

to handle foreclosure proceedings as to the Glenwood Avenue Property.

198.     On information and belief, the firm charged approximately $235 each for personal service on each defendant at the Glenwood Avenue Property.  This amount was well above market rates, which were between $20-$40 per person.  In fact, on information and belief, the firm or its affiliated service-of-process company hired another process service vendor to serve each person at market rates and simply marked up those invoices to approximately $235 per defendant.

199.     On information and belief, the firm submitted these invoices, with unreasonable and unnecessary foreclosure charges, to Bank of America.

200.     On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after July 2014, Bank of America overstated its reimbursement claim, seeking the whole amount from Fannie Mae.

201.     On information and belief, Fannie Mae paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

#### f.   The South Palmetto Avenue Property Example (Bank of America)

202.     Freddie Mac held a mortgage on a property on South Palmetto Avenue in Daytona Beach, Florida ("the Palmetto Avenue Property").  Freddie Mac contracted with Bank of America to service the mortgage on the South Palmetto Avenue Property.

203.     Under contract with Freddie Mac, Bank of America engaged the Stern Firm to handle foreclosure proceedings as to the South Palmetto Avenue Property.

204.     The Stern Firm charged approximately $400 for title work on the South Palmetto Avenue Property.  This amount was well above market rates.  In fact, on information and belief,

the title work was completed by an unaffiliated title company for between $100 and $150, and then marked up.

205.    The Stern Firm also charged approximately $112 each for personal service on each defendant at the South Palmetto Avenue Property.  This amount was well above market rate, which was approximately $45 per person.

206.    On information and belief, the Stern Firm submitted these invoices, with unreasonable title and service-of-process charges, to Bank of America.

207.    On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after July 2010, Bank of America overstated its reimbursement claim, seeking the whole amount from Freddie Mac.

208.    On information and belief, Freddie Mac paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

g.    The Elm Street Property Example (Bank of America)

209.    FHA insured a mortgage on a property on Elm Street in Denver, Colorado (the "Elm Street Property").  Bank of America serviced the mortgage on the Elm Street Property.

210.    Bank of America engaged the Law Office of Michael P. Medved, P.C. (the "Medved Firm") to handle foreclosure proceedings as to the Elm Street Property.

211.    On information and belief, the Medved Firm charged approximately $430 for title work on the Elm Street Property.  This amount was well above market rates.  In fact, on information and belief, the title work was completed by an unaffiliated title company for between $100 and $125, and was then marked up to $430.

212.    On information and belief, the Medved Firm submitted this title invoice, with an

unreasonable foreclosure charge, to Bank of America.

213.    On information and belief, Bank of America undertook no effort to review the invoice to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after September 2012, Bank of America overstated its reimbursement claim, seeking the whole amount from FHA.

214.    On information and belief, FHA paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

h.    The Oneida Street Property Example (Chase)

215.    FHA insured a mortgage on a property on Oneida Street in Denver, Colorado (the "Oneida Street Property").  Chase serviced the mortgage on the Oneida Street Property.

216.    Chase engaged the Aronowitz Firm to handle foreclosure proceedings as to the Oneida Street Property.

217.    On information and belief, the Aronowitz Firm charged approximately $950 for title work on the Oneida Street Property.  This amount was well above market rates.  In fact, on information and belief, a title search report could have been obtained from an unaffiliated title company for between $100 and $125.

218.    On information and belief, the Aronowitz Firm submitted this title invoice, with an unreasonable foreclosure charge, to Chase.

219.    On information and belief, Chase undertook no effort to review the invoice to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after February 2013, Chase overstated its reimbursement claim, seeking the whole amount from FHA.

220.    On information and belief, FHA paid Chase's reimbursement claim for

foreclosure expenses, including the unreasonable and therefore unallowable amounts.

i.   The Azalea Drive Property Example (Chase)

221.   FHA insured a mortgage on a property on Azalea Drive in Daytona Beach, Florida (the "Azalea Drive Property").   Chase serviced the mortgage on the Azalea Drive Property.

222.   Chase engaged Albertelli Law (the "Albertelli Firm") to handle foreclosure proceedings as to the Azalea Drive Property.

223.   On information and belief, the Albertelli Firm charged approximately $400 for title work on the Azalea Drive Property.  This amount was well above market rates.  In fact, on information and belief, the Albertelli Firm purchased such title work from an affiliated title company for between $100 and $150, and then marked up the bill.

224.   On information and belief, the Albertelli Firm charged approximately $220 for personal service upon the defendant in the foreclosure case.  This amount was well above the market rate, which was approximately $45 per person.  In fact, on information and belief, the Albertelli Firm or its affiliated service-of-process company hired another process service company to serve each person at market rates and marked up those invoices to approximately $220 per defendant.

225.   On information and belief, the Albertelli Firm submitted these title and service-of-process invoices, with unreasonable foreclosure charges, to Chase.

226.   On information and belief, Chase undertook no effort to review the invoice to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after September 2012, Chase overstated its reimbursement claim, seeking the whole amount from FHA.

227.   On information and belief, FHA paid Chase's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

j.   The Clark Street Property Example (Chase)

228.   FHA insured a mortgage on a property on Clark Street in Tonawanda, New York (the "Clark Street Property").  Chase serviced the mortgage on the Property.

229.   Chase engaged the Shapiro Firm to handle foreclosure proceedings as to the Clark Street Property.

230.   On information and belief, the Shapiro Firm charged approximately $486 for title work on the Clark Street Property.  This amount was well above the market rate, which was approximately $100-$250.

231.   On information and belief, the Shapiro Firm charged approximately $210 each for personal service on each defendant served in the foreclosure case.  This amount was well above the market rate, which was approximately $20-$40 per person.

232.   On information and belief, the Shapiro Firm charged for services that were unnecessary or inflated, such as $95 for an attempted service at the borrower's former residence, even though Chase's pre-foreclosure notices to the borrower reflected the borrower's current address.

233.   On information and belief, the Shapiro Firm charged for services that were part of the Firm's or the vendor's administrative overhead or included within the Firm's attorney fee, such as $50 for "filing" the affidavits on the court's electronic filing system and $24 for "copies.

234.   On information and belief, the Shapiro Firm submitted the foregoing title and service-of-process invoices, with unreasonable foreclosure charges, to Chase.

235.   On information and belief, Chase undertook no effort to review the foregoing

invoices to determine which amounts were reasonable and necessary and which were not; rather, sometime after March 2015, Chase overstated its reimbursement claim, seeking the whole amount from FHA.

236.   On information and belief, FHA paid Chase's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

### k.   The Felton Street Property Example (Bank of America)

237.   FHA insured a mortgage on a property on Felton Street in North Tonawanda, New York (the "Felton Street Property").  Bank of America serviced the mortgage on the Felton Street Property.

238.   Bank of America engaged a New York law firm to handle foreclosure proceedings as to the Felton Street Property.

239.   On information and belief, the firm charged $319 or greater for title work on the Felton Street Property.  This amount was well above market rates, which were between $100-$250.  In fact, on information and belief, the firm or its affiliated title company purchased such title work from an unaffiliated title company for less than $250.

240.   On information and belief, the firm charged approximately $180 each for personal service on each defendant at the Felton Street Property.  This amount was well above market rates, which were between $20-$40 per person.  In fact, on information and belief, the firm or its affiliated service-of-process company hired another process service company to serve each person at market rates and marked up those invoices to approximately $180 per defendant.

241.   On information and belief, the firm submitted these invoices, with unreasonable foreclosure charges, to Bank of America.

242.    On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after October 2015, Bank of America overstated its reimbursement claim, seeking the whole amount from FHA.

243.    On information and belief, FHA paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

l.    The Orchard Street Property Example (Bank of America)

244.    Freddie Mac held a mortgage on a property on Orchard Street in Montebello, New York (the "Orchard Street Property").  Freddie Mac contracted with Bank of America to service the mortgage on the Orchard Street Property.

245.    Under contract with Freddie Mac, Bank of America engaged Fein, Such & Crane, LLP ("Fein Such") to handle foreclosure proceedings as to the Orchard Street Property.

246.    On information and belief, Fein Such charged approximately $485 or greater for title work on the Orchard Street Property.  This amount was well above market rates, which were approximately $100-$250.

247.    On information and belief, Fein Such charged approximately $225 each for personal service upon each defendant in the foreclosure case.  This amount was well above market rates, which were between $20-$40 per person.

248.    On information and belief, Fein Such submitted these invoices, with unreasonable foreclosure charges, to Bank of America.

249.    On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after August 2014, Bank of America overstated its reimbursement claim,

seeking the whole amount from Freddie Mac.

250.    On information and belief, Freddie Mac paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

m.    The Country Club Lane Property Example (Chase)

251.    Freddie Mac held a mortgage on a property on Country Club Lane in Pomona, New York (the "Country Club Lane Property").  Freddie Mac contracted with Chase to service the Country Club Lane Property.

252.    Under contract with Freddie Mac, Chase engaged the McCabe Firm to handle foreclosure proceedings as to the Country Club Lane Property.

253.    On information and belief, the McCabe Firm contracted with its affiliated title search vendor, REO, to bill for title searches relating to the Country Club Lane Property.

254.    On information and belief, REO invoiced the McCabe Firm approximately $445 for title searches relating to the Country Club Lane Property.  This amount was well above market rates, which were approximately $100-$250.  In fact, on information and belief, REO hired another company to conduct the title search at market rates and simply marked up those invoices to approximately $445.

255.     On information and belief, the McCabe Firm contracted with its affiliated service-of-process vendor, AOSS, to bill for service of process on the foreclosure defendants.

256.    On information and belief, AOSS invoiced the McCabe Firm approximately $180 each for personal service upon each defendant named in the foreclosure case.  This amount was well above market rates, which were between $20-$40 per person.  In fact, on information and belief, AOSS hired another process service company to serve each person at market rates and marked up those invoices to approximately $180 per defendant.

257.    On information and belief, the McCabe Firm submitted these invoices, with unreasonable foreclosure charges, to Chase.

258.    On information and belief, Chase undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after October 2016, Chase overstated its reimbursement claim, seeking the whole amount from Freddie Mac.

259.    On information and belief, Freddie Mac paid Chase's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

n.    The Hinman Avenue Property Example (Bank of America)

260.    Freddie Mac held a mortgage on a property on Hinman Avenue in Buffalo, New York (the "Hinman Avenue Property").   Freddie Mac contracted with Bank of America to service the Hinman Avenue Property.

261.    Under contract with Freddie Mac, Bank of America engaged the Shapiro Firm to handle foreclosure proceedings as to the Hinman Avenue Property.

262.    On information and belief, the Shapiro Firm charged at least $345 or greater for title work on the Hinman Avenue Property.  This amount was well above market rates, which were approximately $100-$250.

263.    On information and belief, the Shapiro Firm charged $1,562 or greater for service-of-process work on the Hinman Avenue Property, including charges of approximately $175 each for personal service upon each defendant in the foreclosure case.  This amount was well above market rates, which were between $20-$40 per person.

264.    On information and belief, the Shapiro Firm submitted these invoices, with unreasonable and unnecessary foreclosure charges, to Bank of America.

265.    On information and belief, Bank of America undertook no effort to review the invoice to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after December 2015, Bank of America overstated its reimbursement claim, seeking the whole amount from Freddie Mac.

266.    On information and belief, Freddie Mac paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

o.    The West Irvington Place Property Example (Bank of America)

267.    Freddie Mac held a mortgage on a property on West Irvington Place in Denver, Colorado (the "West Irvington Place Property").  Freddie Mac contracted with Bank of America to service the mortgage on the West Irvington Place Property.

268.    Under contract with Freddie Mac, Bank of America engaged the Aronowitz Firm to handle foreclosure proceedings as to the West Irvington Place Property.

269.    On information and belief, the Aronowitz Firm charged at least $336 for title work on the West Irvington Place Property.  This amount was well above market rates.  In fact, on information and belief, a title report could have been obtained from an unaffiliated title company for between $100 and $125.

270.    On information and belief, the Aronowitz Firm submitted this title invoice, with an unreasonable foreclosure charge, to Bank of America.

271.    On information and belief, Bank of America undertook no effort to review the invoice to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after March 2013, Bank of America overstated its reimbursement claim, seeking the whole amount from Freddie Mac.

272.    On information and belief, Freddie Mac paid Bank of America's reimbursement

claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

p.   The Utica Street Property Example (Bank of America)

273.    Freddie Mac held a mortgage on a property on Utica Street in Denver, Colorado (the "Utica Street Property").  Freddie Mac contracted with Bank of America to service the mortgage on the Utica Street Property.

274.    Under contract with Freddie Mac, Bank of America engaged the Medved Firm to handle foreclosure proceedings as to the Utica Street Property.

275.    On information and belief, the Medved Firm charged at least $480 for title work on the Utica Street Property.  This amount was well above market rates.  In fact, on information and belief, the title work was completed by an unaffiliated title company for between $100 and $125.

276.    On information and belief, the Medved Firm submitted this title invoice, with an unreasonable foreclosure charge, to Bank of America.

277.    On information and belief, Bank of America undertook no effort to review the invoice to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after March 2013, Bank of America overstated its reimbursement claim, seeking the whole amount from Freddie Mac.

278.    On information and belief, Freddie Mac paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

q.   The Oakland Avenue Property Example (Chase)

279.    Fannie Mae held a mortgage on a property on Oakland Avenue in Harrison, New York (the "Oakland Avenue Property").  Fannie Mae contracted with Chase to service the mortgage on the Oakland Avenue Property.

280.    Under contract with Fannie Mae, Chase engaged Fein Such to handle foreclosure proceedings as to the Oakland Avenue Property.

281.    On information and belief, Fein Such charged approximately $490 or greater for title work on the Oakland Avenue Property.  This amount was well above market rates, which were between $100-$250.

282.    On information and belief, Fein Such charged approximately $312 each for personal service upon each of the two defendants named in the foreclosure case (one of whom was deceased).  This amount was well above market rates, which were between $20-$40 per person.

283.    On information and belief, Fein Such submitted these invoices, with unreasonable foreclosure charges, to Chase.

284.    On information and belief, Chase undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after September 2015, Chase overstated its reimbursement claim, seeking the whole amount from Fannie Mae.

285.    On information and belief, Fannie Mae paid Chase's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

        r.    The American Heritage Parkway Property Example (Bank of America)

286.    Fannie Mae held a mortgage on a property on American Heritage Parkway in Orlando, Florida (the "American Heritage Parkway Property").  Fannie Mae contracted with Bank of America to service the mortgage on the American Heritage Parkway Property.

287.    Under contract with Fannie Mae, Bank of America engaged Butler & Hosch, P.A. ("Butler & Hosch") to handle foreclosure proceedings as to the American Heritage Parkway

Property.

288.    On information and belief, Butler & Hosch charged approximately $400 or greater for title work on the American Heritage Parkway Property.  This amount was well above market rates, which were between $100-$150.  In fact, on information and belief, Butler & Hosch or its affiliated title company purchased the title work from an unaffiliated title company for between $100-$150 and then marked up the invoice to approximately $400 or greater.

289.    On information and belief, Butler & Hosch charged approximately $130 each for personal service upon each defendant in the foreclosure case.  This amount was well above the market rate, which was approximately $45 per person.  In fact, on information and belief, Butler & Hosch or its affiliated service-of-process company hired another process service company to serve each person at market rates and marked up those invoices to approximately $130 per defendant.

290.    On information and belief, Butler & Hosch submitted these invoices, with unreasonable foreclosure charges, to Bank of America.

291.    On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after October 2012, Bank of America overstated its reimbursement claim, seeking the whole amount from Fannie Mae.

292.    On information and belief, Fannie Mae paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

s.  The Hawthorne Avenue Property Example (Chase)

293.    Fannie Mae held a mortgage on a property on Hawthorne Avenue in Yonkers, New York (the "Hawthorne Avenue Property").  Fannie Mae contracted with Chase to service

the mortgage on the Hawthorne Avenue Property.

294.    Under contract with Fannie Mae, Chase engaged the Rosicki Firm to handle foreclosure proceedings as to the Hawthorne Avenue Property.

295.    On information and belief, the Rosicki Firm arranged with its affiliated title vendor, Paramount, to bill for title searches relating to the Hawthorne Avenue Property.

296.    On information and belief, Paramount invoiced the Rosicki Firm approximately $525 for title searches relating to the Hawthorne Avenue Property.  This amount is well above market rates, which were approximately $100-$250.   In fact, on information and belief, Paramount hired another company to conduct the title search at market rates and simply marked up those invoices to approximately $525.

297.    On information and belief, the Rosicki Firm submitted the foregoing title invoices, with unreasonable foreclosure charges, to Chase.

298.    On information and belief, Chase undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which were not; rather, sometime after December 2012, Chase overstated its reimbursement claim, seeking the whole amount from Fannie Mae.

299.    On information and belief, Fannie Mae paid Chase's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

t.    The Townhall Lane Property Example (Bank of America)

300.    Fannie Mae held a mortgage on a property on Townhall Lane in Orlando, Florida (the "Townhall Lane Property").  Fannie Mae contracted with Bank of America to service the mortgage on the Townhall Lane Property.

301.    Under contract with Fannie Mae, Bank of America engaged Shapiro, Fishman & Gaché LLP ("Shapiro Fishman") to handle foreclosure proceedings as to the Townhall Lane Property.

302.    On information and belief, Shapiro Fishman charged approximately $90 each for personal service upon each defendant in the foreclosure case.  This amount was well above the market rate, which was approximately $45 per person.

303.    On information and belief, Shapiro Fishman submitted this invoice, with unreasonable foreclosure charges, to Bank of America.

304.    On information and belief, Bank of America undertook no effort to review the invoice to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after September 2013, Bank of America overstated its reimbursement claim, seeking the whole amount from Fannie Mae.

305.    On information and belief, Fannie Mae paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

u.    The D Street Property Example (Bank of America)

306.    FHA insured a mortgage on a property on D Street in Niagara Falls, New York (the "D Street Property").  Bank of America serviced the mortgage on the D Street Property.

307.    Bank of America engaged a New York law firm to handle foreclosure proceedings as to the D Street Property.

308.    On information and belief, the firm charged approximately $155 each for personal service on each defendant at the D Street Property.  This amount was well above market rates, which were between $20-$40 per person.  In fact, on information and belief, the firm or its affiliated service-of-process company hired another process service company to serve each

person at market rates and marked up those invoices to approximately $155 per defendant.

309.    On information and belief, the firm submitted these invoices, with unreasonable foreclosure charges, to Bank of America.

310.    On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after July 2014, Bank of America overstated its reimbursement claim, seeking the whole amount from FHA.

311.    On information and belief, FHA paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

                    v.   The Pioneer Avenue Example (Bank of America)

312.    Fannie Mae held a mortgage on a property on Pioneer Avenue in Suffern, New York (the "Pioneer Avenue Property").  Fannie Mae contracted with Bank of America to service the mortgage on the Pioneer Avenue Property.

313.    Under contract with Fannie Mae, Bank of America engaged the Shapiro Firm to handle foreclosure proceedings as to the Pioneer Avenue Property.

314.    On information and belief, the Shapiro Firm charged approximately $1,040 or greater for title work on the Pioneer Avenue Property.  This amount was well above market rates, which were approximately $100-$250.

315.    On information and belief, the Shapiro Firm charged approximately $320 each for personal service upon each defendant in the foreclosure case.  This amount was well above market rates, which were between $20-$40 per person.

316.    On information and belief, the Shapiro Firm submitted these invoices, with unreasonable foreclosure charges, to Bank of America.

317.   On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after October 2015, Bank of America overstated its reimbursement claim, seeking the whole amount from Fannie Mae.

318.   On information and belief, Fannie Mae paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

### w.   The Lincoln Avenue Property Example (Bank of America)

319.   Fannie Mae held a mortgage on a property on Lincoln Avenue in New Rochelle, New York (the "Lincoln Avenue Property").  Fannie Mae contracted with Bank of America to service the mortgage on the Lincoln Avenue Property.

320.   Bank of America engaged a New York law firm to handle foreclosure proceedings as to the Lincoln Avenue Property.

321.   On information and belief, the firm  charged $340 or greater for title work on the Lincoln Avenue Property.  This amount was well above market rates, which were between $100-$250.  In fact, on information and belief, the firm or its affiliated title company purchased such title work from an unaffiliated title company for less than $250.

322.   On information and belief, the firm charged approximately $190 each for personal service on each defendant at the Lincoln Avenue Property, two of whom lived at the Property and were served at the same time.  This amount was well above market rates, which were between $20-$40 per person.  In fact, on information and belief, the firm or its affiliated service-of-process company hired another process service company to serve each person at market rates and marked up those invoices to approximately $190 per defendant.

323.   On information and belief, the firm submitted these invoices, with unreasonable

and unnecessary foreclosure charges, to Bank of America.

324.    On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after September 2014, Bank of America overstated its reimbursement claim, seeking the whole amount from Fannie Mae.

325.    On information and belief, Fannie Mae paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

x.    The Greenwood Avenue Property Example (Bank of America)

326.    FHA insured a mortgage on a property on Greenwood Avenue in West Seneca, New York (the "Greenwood Avenue Property").  Bank of America serviced the mortgage on the Greenwood Avenue Property.

327.    Bank of America engaged a New York law firm to handle foreclosure proceedings as to the Greenwood Avenue Property.

328.    On information and belief, the firm charged approximately $115 each for personal service on each defendant at the Greenwood Avenue Property.  This amount was well above market rates, which were between $20-$40 per person.  In fact, on information and belief, the firm or its affiliated service-of-process company hired another process service company to serve each person at market rates and marked up those invoices to approximately $115 per defendant.

329.    On information and belief, the firm charged approximately $400 or greater for title work on the Greenwood Avenue Property.  This amount was well above market rates, which were between $100-$250.  In fact, on information and belief, the firm or its affiliated title company purchased such title work from an unaffiliated title company for less than $250.

330.    On information and belief, the firm submitted these invoices, with unreasonable

foreclosure charges, to Bank of America.

331.    On information and belief, Bank of America undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after September 2014, Bank of America overstated its reimbursement claim, seeking the whole amount from FHA.

332.    On information and belief, FHA paid Bank of America's reimbursement claim for foreclosure expenses, including the unreasonable and therefore unallowable amounts.

* * * * *

333.    The above examples are only illustrative of a pattern and practice of impermissible overcharges of foreclosure expenses procured by law firms nationwide, as illustrated (but not limited to) the practices of the Rosicki, McCabe, Aronowitz, Medved, Fein Such, Albertelli, Stern, Butler & Hosch, Shapiro Fishman, and Shapiro firms.

334.    Even a review of limited public foreclosure records reveals that each Defendant hired at least one of the firms cited in the examples above frequently and over a period of years. Had Defendants done any review of the expenses charged by these firms – or by many other firms generating similar markups and overcharges – as the Defendants were required by Fannie Mae, Freddie Mac, and FHA rules, such overcharges would have been apparent.

### 2.  The Defendants Avoided Obligations to Repay Overpayments.

335.    On information and belief, after receiving overpayments from the GSEs and FHA based on overstated claims for foreclosure expenses as alleged above and otherwise, the Defendants knowingly retained those overpayments, concealed them, and avoided returning and repaying them.

336.    Specifically, on information and belief, none of the Defendants has returned the

overpayments it received, which included unallowable costs for foreclosure expenses that were unnecessary, unreasonable, or both.

337.    Under the False Claims Act, the Defendants had an obligation to return retained overpayments.

338.    Furthermore, under the Fannie Mae contract, the Defendants had an obligation to return overpayments made by Fannie Mae for any unreasonable or excessive foreclosure fees or costs charged by vendors affiliated with the Defendants' law firms.

339.    For instance, Section 106 of the *Servicing Guide* (Mar. 14, 2012 ed.) stated that each servicer had an obligation to "monitor[] the fees and expenses charged by any Affiliated Business Entity" and "reimburse Fannie Mae for any unreasonable or excessive fees or costs."

340.    Likewise, under HUD rules, the Defendants had an obligation to return overpayments made by FHA for costs paid as a result of the banks' erroneous inclusion of unreasonable or excessive foreclosure fees on claims forms.

341.    None of the Defendants, on information and belief, complied with this obligation.

342.    Indeed, on information and belief, none of the Defendants made any effort to comply with this obligation.

343.    Rather, on information and belief, the Defendants wrongfully concealed such overpayments and avoided repaying them.

344.    The Defendants retained overpayments despite the red flags listed above and otherwise, including their knowledge that the U.S. Department of Justice was investigating whether such overpayments were received because the Defendants knowingly submitted false claims, and including their knowledge that another servicer had admitted violating GSE and FHA rules by submitting overstated claims for foreclosure expense reimbursement.

345.    The Defendants thus, on information and belief, intentionally or recklessly failed to take the necessary steps to timely identify overpayments or to timely reimburse the GSEs and FHA for their foreclosure expense reimbursement claims that resulted in overbilling the GSEs and FHA.

**C.    Grubea's Discovery of the Frauds**

346.    Grubea, the Relator, was uniquely placed to discover direct and independent knowledge of defendants' wrongdoing.  He has been a consumer and business bankruptcy lawyer since 1994.  In 1997, he opened his own practice, which was for a time the largest bankruptcy practice of its kind in New York State based on annual filings.  Grubea has personally handed more than 12,000 bankruptcy cases, including more than 4,000 Chapter 13 cases.

347.    In the course of his bankruptcy practice, Grubea discovered a pattern of foreclosure-related proofs-of-claims presenting unreasonable costs.   Those claims included foreclosure fees beyond any reasonable sum, as well as fees for unnecessary work.   Grubea found that, when he challenged servicers on these costs, they often reduced their bankruptcy claims.  In addition, Grubea studied market rates for foreclosure fees, and found that servicers and their law firms were regularly claiming supra-market rates.

348.    Grubea also obtained direct and independent knowledge of these schemes through his communications with lawyers from large foreclosure law firms.

349.    These communications included communications with a partner in the now-defunct foreclosure law firm of Steven J. Baum, P.C., the largest foreclosure firm in New York until 2012, which, on information and belief, handled 40% of all foreclosure in the State, including foreclosures for the Defendants.    These communications also included communications with lawyers at the Rosicki Firm and with partners of other firms throughout the

country with affiliate vendors.   From such conversations, Grubea obtained non-public information about the affiliate vendor business model of such law firms and the related practices of servicers, like the Defendants.

350.   Grubea's direct and independent knowledge included, among other things, knowledge of the practices of the Defendants in paying for inflated and unnecessary foreclosure expenses, without any real effort to obtain the best value or exercise quality control over vendor fees, knowledge about the affiliate business model, knowledge about the mark-up practices of the affiliate vendors, and knowledge of specific examples of unreasonable and unnecessary foreclosure fees being generated and paid by servicers, such as the Defendants.

351.   Prior to filing this action, Grubea disclosed information relating to his direct and independent knowledge to the Government.

352.   On information and belief, prior to Grubea's disclosure, no one had identified or disclosed these nationwide problems.

**FIRST CLAIM**
**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(A))**
**Presentation of False Claims**

353.   This Complaint incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

354.   Defendants knowingly presented and/or caused to be presented, to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, false and fraudulent claims for payment in connection with claims for reimbursement by Fannie Mae, Freddie Mac, and FHA by:

a.  submitting false annual certifications and making false representations to Fannie

Mae, Freddie Mac, and FHA with respect to the Defendants' qualifications for

participation in the Fannie Mae, Freddie Mac, and/or FHA servicing program; and

b.  submitting false or fraudulent claims to FHA, Freddie Mac, and/or FHA for

reimbursement of foreclosure costs.

355.    The Government paid claims and incurred losses, and/or contractors, grantees, or

other recipients of Government funds used to advance Government interests paid claims and

incurred losses, as a result of Defendants' wrongful conduct.

356.    By reason of such false and/or fraudulent claims, the United States has been

damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as

required by law for each violation.

**SECOND CLAIM**
**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(B))**
**Use of False Statements**

357.    This Complaint incorporates by reference each of the preceding paragraphs as if

fully set forth in this paragraph.

358.    Defendants knowingly made, used, or caused to be made or used, false records

and/or statements material to false or fraudulent claims to the Government and/or to contractors,

grantees, or other recipients of Government funds used to advance Government interests, in

connection with claims for reimbursement by Fannie Mae, Freddie Mac, and/or FHA.

359.    The Government paid claims and incurred losses, and/or contractors, grantees, or

other recipients of Government funds used to advance Government interests paid claims and

incurred losses, as a result of Defendants' wrongful conduct.

360.    By reason of such false and/or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

### THIRD CLAIM
**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(G))**
**Reverse False Claim**

361.    This Complaint incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

362.    Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

363.    Such false records or statements, or such knowing concealment, avoidance, or decrease of an obligation to pay or transmit money to the United States, were made or done knowingly.

### FOURTH CLAIM
**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(G))**
**Reverse False Claims**

364.    This Complaint incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

365.    As set forth above, by knowingly causing falsely inflated foreclosure expenses to be submitted to Fannie Mae and Freddie Mac for reimbursement, Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States for any quarter in which Fannie Mae or Freddie Mac was

obligated to pay Treasury a quarterly dividend following the Third Amendment to the Fannie Mae and Freddie Mac SPAs.

366.     Because the Third Amendment to each SPA obligates Fannie Mae and Freddie Mac to make quarterly dividend payments of their net worth exceeding a capital reserve amount, and because any money that they used to pay servicing expenses necessarily resulted in a decrease to their net worth, the monies that Fannie Mae and Freddie Mac paid for reimbursement of false and inflated foreclosure expenses have decreased the amount of dividend payments to which the United States otherwise would have been entitled and received.

WHEREFORE, Relator, for and on behalf of the United States, respectfully demands and prays that the Court enter judgment in Plaintiffs' favor against Defendants as follows:

1.  A judgment in the amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty as required by law for each violation of 31 U.S.C. § 3729;

2.  A judgment awarding Relator the maximum amount allowed under 31 U.S.C. § 3730(d) for bringing this action;

3.  A judgment awarding Relator all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d); and

4.  Awarding such other relief for the United States and Relator as this Court deems just and proper.

## Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated:    April 3, 2018                                        Respectfully submitted,

WILLENS & SCARVALONE LLP

By:   */s/ Edward Scarvalone*
Edward Scarvalone
40 Wall Street, Suite 4100
New York, New York 10005
Tel. (646) 200-6334
Fax (800) 879-7938
escarvalone@willensscarvalone.com

SUSMAN GODFREY LLP

*/s/ Jacob W. Buchdahl*
Jacob W. Buchdahl
Arun Subramanian
Cory S. Buland
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
Telephone No. (212) 336-8330
Fax No. (212) 336-8340
jbuchdahl@susmangodfrey.com
asubramanian@susmangodfrey.com
cbuland@susmangodfrey.com

*Attorneys for Relator Peter D. Grubea*